IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HIRIAM HICKS, INC.              :              CIVIL ACTION
                               :
        v.                     :
                               :
SYNAGRO WWT, LLC               :              NO. 11-3154

MEMORANDUM

Dalzell, J.                                    May 31, 2012

As will be seen, this case provides a primer on how to procure multimillion dollar service contracts with the City of Philadelphia.

The dispute here arises out of a consulting agreement (the "Agreement") between Hiriam Hicks, Inc. ("HHI"), the plaintiff and counterclaim defendant, and Synagro WWT, LLC ("Synagro"), the defendant and counterclaim plaintiff.  Synagro contracted with HHI to provide it with assistance in securing a major waste management contract (the "Contract") with the City of Philadelphia.  By the terms of the Agreement, HHI was entitled to a monthly retainer before passage of certain bills through the City Council of certain bills regarding the Contract, a lump sum retainer upon Contract execution, and the option to provide valuable subcontracting services for the twenty-three year term of the waste management project after Contract execution -- provided that the "Contract with the City [was] approved" by June 30, 2008.

Philadelphia City Council indeed passed the enabling bills relating to the Contract, but a burgeoning bribery scandal involving Synagro in Detroit led Mayor Michael Nutter to instruct Joan Markman ("Markman"), his Chief Integrity Officer, to scrutinize the proposed Contract between the City and Synagro. Synagro contends that in the course of Markman's investigation, HHI's principal, Hiriam Hicks ("Hicks"), breached the terms of the Agreement, leading Synagro to terminate the Agreement before HHI could lay claim to the retainer it was due upon execution of the Contract or exercise its option to provide subcontracting services for the term of the project.  Synagro also claims "the Contract with the City [was not] approved" by June 30, 2008, so that HHI is not entitled to provide further services under the Agreement.  Finally, Synagro argues that the City's renegotiation of the Contract following Markman's investigation frustrated the purposes of the Agreement, so that Synagro's obligation to HHI under the Agreement is discharged.

HHI asserts that, as a matter of law, the "Contract with the City" <u>was</u> approved by June 30, 2008.  It further suggests that Hicks's behavior during the Markman investigation did not breach the Agreement, and that frustration of purpose does not apply here.

2

HHI asserts three claims against Synagro: (1) breach of contract, (2) anticipatory breach of contract, and (3) unjust enrichment. Synagro advances four counterclaims of its own: (1) breach of contract, (2) breach of common law duty, (3) conversion, and (4) fraud.[1] Synagro has filed a motion in which it urges us to grant summary judgment in its favor on each of HHI's claims.

HHI has filed its own motion for partial summary judgment. It seeks a finding "that [its] right to provide services, and to be paid, under a portion of [its] Consulting Agreement with Defendant, Synagro WWT, Inc. has not 'expired' within the meaning of Section 1 of the Consulting Agreement because the requisite 'approval' of the City Council was timely obtained." Pl.'s Mot. Summ. J. at 1.

Synagro has also filed a motion to strike the Declaration Hicks submitted in opposition to Synagro's motion for

---

[1] We have jurisdiction over this matter pursuant to 28 U.S.C. § 1332 inasmuch as HHI is a corporation organized under the laws of Delaware with its principal place of business in Georgia, and Synagro is a corporation organized under the laws of Florida with its principal place of business in Texas. Pl.'s Stmt. of Facts ¶¶ 1-2; Def.'s Resp. to Pl.'s Stmt. of Facts ("Def.'s Resp.") ¶¶ 1-2. As HHI seeks "[a]n award of actual and consequential damages in an amount to be determined at trial but not less than $9,280,000.00", Pl.'s Compl. at 5, the amount in controversy far exceeds the jurisdictional threshold.

summary judgment.  HHI has filed a motion to amend this Declaration.

For the reasons set forth at length below, we will grant Synagro's motion to strike Hicks's declaration in part, deny Synagro's motion for summary judgment, and grant HHI's motion for partial summary judgment.

## I.   Synagro's Motion to Strike Hicks's Declaration

Synagro takes issue with HHI's submission of "a rambling, 43-page declaration from its principal, Hiriam Hicks." Def.'s Mot. Strike at 1.  According to Synagro,

> The mandate of Rule 56(c)(4) is clear: all statements in a declaration submitted in support of or in opposition to a motion for summary judgment must be based on personal knowledge.  Hicks concedes in Paragraph 1 of his Declaration that numerous statements he makes are not based on such knowledge. . . . Hicks's Declaration is also replete with argument and legal conclusions, neither of which is appropriate in a declaration from a purported fact witness.

Id. at 2 (internal citations omitted).

HHI responds that (1) "the material objected to as argumentative . . . was intended to provide context to the statement of facts, and to make clear how the facts in the Hicks Declaration tied in to the legal arguments," Pl.'s Resp. to

Def.'s Mot. Strike at 1; (2) "short, non-argumentative statements as to the evidence to be found in the various exhibits to that declaration" are meant to act as "pointers to what the Court is asked to accept as fact based on the exhibits," id. at 2; and (3) "[t]he Hicks Declaration indeed refers to statements made by others," but "the out-of-court declarants are all named and can be produced at trial, and so those statements are admissible at this stage, even if they otherwise would constitute hearsay." Id. at 3.  HHI nonetheless explains that "[i]n an effort to avoid unnecessary motion practice, plaintiff has submitted with the Proposed Order a proposed amended declaration from which argumentative statements have been surgically removed, while maintaining the flow of Mr. Hicks' summary of his own direct knowledge, into which is woven references to the exhibits."  Id. at 4.

Fed. R. Civ. P. 56(c) provides that

(2)   Objection That a Fact Is Not Supported by Admissible Evidence.  A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

. . .

(4)   Affidavits or Declarations.  An affidavit or declaration used to support

5

> or oppose a motion must be made on
> personal knowledge, set out facts that
> would be admissible in evidence, and
> show that the affiant or declarant is
> competent to testify on the matters
> stated.

Without any doubt, Hicks's Declaration and proposed Declaration breach these rules.  A party may "make clear how the facts in [a declaration] tied in to the legal arguments," Pl.'s Resp. to Def.'s Mot. Strike at 1, in a memorandum of law.  It may provide "pointers to what the Court is asked to accept as fact based on the exhibits," id. at 2, in a statement of facts.  Neither has any place in an affidavit or declaration, which are not baskets or braided pigtails through which "references to the exhibits" must be "woven."  Id. at 4.

As for HHI's contention that the availability of declarants who might testify at trial permits introduction of their hearsay statements, this notion is preposterous.  As our Court of Appeals has explained, "[h]earsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment," Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009), regardless of whether a declarant might later be persuaded to testify at trial.

We will accordingly grant Synagro's motion to strike

6

and deny HHI's motion to amend declaration, and will ignore the portions of Hicks's Declaration that contain (1) legal argument, (2) summaries of exhibits, or (3) inadmissible hearsay.  Where HHI refers to passages of Hicks's Declaration that cite to exhibits, we will consider the underlying exhibit in ascertaining whether the proposed fact is supported by "particular parts of materials in the record."  Rule 56(c)(1)(A).

## II.  **Factual Background**

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," where "[a] party asserting that there is a genuine dispute as to a material fact must support that assertion with specific citations to the record."  Bello v. Romeo, 424 Fed. Appx. 130, 133 (3d Cir. 2011).  We will thus set out the undisputed material facts in this matter, as well as the disputed material factual assertions that the parties have supported with specific citations to the record.  Because Synagro and HHI's respective statements of fact canvass essentially the same subjects, with Synagro's statement covering these facts in greater detail, we largely draw our account of the facts from

Synagro's statement and HHI's response thereto.

**A.** **Synagro's Proposed Project**

Synagro engages in "biosolids reprocessing," or the process of treating and disposing of solid human waste. Def.'s Stmt. of Facts ("Def.'s Stmt.") ¶ 1; Pl.'s Resp. to Def.'s Stmt. ("Pl.'s Resp.") ¶ 1. In 2004, the City issued a Request for Proposals ("RFP") regarding the provision of reprocessing services to the City. The City's treatment process then consisted only of "dewatering" waste into a paste (known as "sludge") and hauling it away from the City's plant, located near the Philadelphia International Airport. Def.'s Stmt. ¶¶ 1-2; Pl.'s Resp. ¶¶ 1-2. Synagro responded to the City's RFP and proposed adding a "drying" facility at the plant that would dry the "sludge" into solid pellets that could be used as fertilizer or fuel. Def.'s Stmt. ¶¶ 1-2; Pl.'s Resp. ¶¶ 1-2. By 2007, however, Synagro's efforts to provide treatment services to the City had run aground, as opposition from the American Federation of State, County and Municipal Employees ("AFSCME") -- the union representing the workers who operated the City's treatment plant -- and Pete Matthews ("Matthews"), President of AFSCME District Council 33, caused the project to be held up in a City Council

subcommittee.  Def.'s Stmt. ¶ 3; Pl.'s Resp. ¶ 3.

The proposed contractual relationship between the City and Synagro actually involved two "mirror" contracts: (1) a "Service Contract" between the City and the Philadelphia Municipal Authority ("PMA"), and (2) a "Service Agreement" between PMA and Philadelphia Biosolids Services, LLC ("PBS"), a joint venture that is 70% owned by Synagro and 30% owned by two minority business enterprises.  Def.'s Stmt. ¶ 18; Pl.'s Resp. ¶ 18.  For these contracts to be finalized, City Council needed to pass bills or ordinances authorizing them.  Def.'s Stmt. ¶¶ 14, 16-17; Pl.'s Resp. ¶¶ 14, 16-17.  The Philadelphia Home Rule Charter provides, however, that an ordinance passed by the City Council does not become effective until it has been either signed by the Mayor or passed by City Council "'by a vote of two-thirds of all of its members within seven days after the bill has been returned with the Mayor's disapproval.'"  Def.'s Stmt. ¶ 16 (quoting Ex. FF to Def.'s Stmt. ("Charter") § 2-202); Pl.'s Resp. ¶ 16.  After an ordinance authorizing a City contract becomes effective, the Mayor and other members of the executive branch must approve the project and negotiate its final terms before it can be finalized, Def.'s Stmt. ¶ 17; Pl.'s Resp. ¶ 17, presumably through formal execution.

B.    __The Agreement Between The Parties__

Hicks is a music industry professional who modestly described himself in his deposition as a "very, very influential manager of big artists".  Def.'s Stmt. ¶6 (quoting Ex. E to Def.'s Stmt. ("Hicks Dep.") at 4-11, 13-14, 16); Pl.'s Resp. ¶6. Before 2007, he had never done any work assisting anyone in obtaining municipal contracts.  Def.'s Stmt. ¶ 7; Pl.'s Resp. ¶ 7.  In 2007, Rayford Jackson ("Jackson"), a consultant working for Synagro in Detroit, introduced Hicks to officers at Synagro, telling them that Hicks was close to Fareed Ahmed ("Ahmed"), whom Jackson described as a community activist and lobbyist who was well-connected in the Philadelphia political community.[2]  Def.'s Stmt. ¶¶ 5, 8; Pl.'s Resp. ¶¶ 5, 8.

On July 12, 2007, Synagro entered into its Agreement with HHI, of which Hiriam Hicks is the CEO and principal.  Def.'s Stmt. ¶¶ 9-10; Pl.'s Resp. ¶¶ 9-10.  According to Hicks, Synagro drafted this Agreement though Hicks proposed amendments to § 1 and Schedule B of this Agreement that Synagro accepted.  Ex. A.

---

[2] Pamela Racey ("Racey"), Synagro's Vice-President of Development, Def.'s Stmt. ¶ 4; Pl.'s Resp. ¶ 4, related in her deposition that Jackson made this statement to her.  Def.'s Stmt. ¶ 8; Pl.'s Resp. ¶ 8.  We will thus consider this statement not for its truth, but merely for the fact that Jackson made it.

to Pl.'s Facts ("Hicks Decl.") ¶¶ 10, 15, 17–18.  The parties
amended the Agreement in October of 2007 to change a critical
date from December 31, 2007 to March 31, 2008, and added an
amended Schedule D.  They amended the Agreement yet again in
early 2008 to change the date in question from March 31, 2008 to
June 30, 2008.  Def.'s Stmt. ¶ 10; Pl.'s Resp. ¶ 10.

> As amended, Section 1 of the Agreement provides:
>
> Consulting Services.  The Company hereby
> retains Consultant[3] as a consultant reporting
> to the Vice President Business Development
> [sic] to provide the advice and services for
> the Company described in Schedule B (the
> 'Consulting Services').  The Consultant shall
> not engage in any conduct or make any
> statement, which in the reasonable opinion of
> the Company, would be deleterious to the good
> will or would injure the business reputation
> of the Company or corporations affiliated
> with the Company.  Consultant shall comply
> with the ethics requirements outlined in
> Schedule A.  The Consulting Services and
> Compensation provided for under this
> Agreement shall expire on June 30, 2008, if
> the Contract with the City is not approved by
> this date, unless extended by mutual
> agreement. . . .

Agreement § 1.  We review the Schedules incorporated in this
provision in greater detail in Section III.A below.  For now, we

---

[3] The Agreement defines the "Company" as "Synagro WWT LLC"
and "Consultant" as "Hiriam Hicks, Inc., Inc. [sic]."  See Ex. A
to Def.'s Stmt. ("Agreement") at 1.

note that Schedule B of the Agreement, describing "Consulting
Services," provides in part that "[i]f these two bills are
successfully voted out of both Sub Committees and obtain full
City Council approval, then [HHI may provide] additional
government and community relations and subcontracting (See
Schedule D) services."  Id. at Schedule B.  In turn, the amended
Schedule D permits HHI to "provide subcontract services for the
term of the project," including conducting community and
governmental relations programs, providing local and certified
minority contractors, and administering chemical and polymer
supply.  Id. at Amended Schedule D.  HHI stood to earn $400,000
for each of twenty-three years for these services, or $9.2
million (undiscounted).  Id.

C.   **Hicks's Efforts On Behalf Of Synagro**

        When Hicks began working for Synagro he was told that
the most pressing issue was Synagro's inability to secure access
to Matthews, President of AFSCME District Council 33.  Hicks
responded by calling Ahmed, who was close to Matthews and had
worked as a consultant for AFSCME District Council 33 for several
years.  Ahmed arranged a meeting between Matthews and Synagro.
Def.'s Stmt. ¶ 22; Pl.'s Resp. ¶ 22.  Ahmed also spoke with Mayor

Nutter about the Contract, and met either with City Council President Anna Verna or her staff member Charlie McPherson about the project, as well as with Janie Blackwell, the chairperson of the City Council subcommittee considering the Contract. Def.'s Stmt. ¶ 25; Pl.'s Resp. ¶ 25.

Hicks also testified that "'it was important for [him] under the terms of the consulting agreement to educate the community'" about Synagro's proposed Contract with the City. Def.'s Stmt. ¶ 27 (quoting Ex. E to Def.'s Stmt. ("Hicks Dep.") at 189-90); Pl.'s Resp. ¶ 27. To this end, Synagro provided Hicks with payments of $30,000 in January of 2008 and $25,000 in April of 2008 to engage in "'community outreach,'" an enterprise entrusted to Sultan Ashley-Shah ("Ashley-Shah"), a Philadelphia community organizer. Def.'s Stmt. ¶¶ 28-29 (quoting Hicks Dep. at 109-10); Pl.'s Resp. ¶¶ 28-29. Ashley-Shah, in turn, used some of this money to pay people -- most of whom from homeless shelters -- to attend a subcommittee hearing in June of 2008. Def.'s Stmt. ¶ 32; Pl.'s Resp. ¶ 32. Ashley-Shah described the ensuing dramatic events that he made possible:

> Q: So a number of people actually went to the City Council hearing, right?
>
> A: About 175 people, close to 200 people were there. . . . And when we got down

there, it was a ruckus.  It was just
total chaos.  We weren't able to
actually get our people into City
Council, but we refused to go.  We
refused to not get our message across.
So we began our march around Council and
began to start protesting making sure
that folks knew and could hear the
message that we came down there to
present relative to our position on
Synagro.

Q:   Do you know an individual by the name of
     Pete Matthews?

A:   Yeah, I think he's a labor leader. . . .
     We got into confrontations with some of
     his people.

Q:   When you say confrontation, what do you
     mean?

A:   Physical confrontations where the police
     actually had to come on the scene.

. . .

Q:   Were people throwing punches at each
     other?

A:   It came to that.

. . .

Q:   Was it one or two isolated instances?

A:   It was a couple of isolated instances. .
     . . The entire atmosphere, the entire
     day was a scene of chaos, inside and
     out.

Ex. L to Def.'s Stmt. ("Ashley-Shah Dep.") at 33-35.  Ashley-Shah

testified that he kept about $14,000 of the $55,000 as his fee. Def.'s Stmt. ¶ 32; Pl.'s Resp. ¶ 32.

### D.   **Synagro's Contract With The City**

The City Council passed three bills relating to Synagro's proposed treatment facility -- two on June 12, 2008, and one on June 19, 2008 -- that accomplished the same ends as the bills referred to in the Agreement, though these bills bore different numbers and had been slightly revised.  Def.'s Stmt. ¶¶ 33-34; Pl.'s Resp. ¶¶ 33-34.  Mayor Nutter signed the first two bills on June 18, 2008, and signed the third -- Bill No. 080498-A -- on July 2, 2008.  Def.'s Stmt. ¶ 35; Pl.'s Resp. ¶ 35.

### E.   **Joan Markman's Investigation**[4]

On July 2, 2008, James Hecht, the Synagro developer responsible for the Philadelphia project, met with Markman and several other representatives of the City.  Def.'s Stmt. ¶ 37; Pl.'s Resp. ¶ 37.  Hecht testified that he had "got[ten] an e-mail about an article or something" concerning "an investigation by the federal government relating to Synagro's efforts to obtain

---

[4] It bears noting that Ms. Markman, before taking her office with the City, served for many years as an Assistant United States Attorney who often appeared before this Court for the Government.

15

a contract in Detroit," Ex. C to Def.'s Stmt. ("Hecht Dep.") at 123, and that he had gone "to notify the city in the form of Bernie Brunwasser, the commissioner, the water commissioner, that there had been an event in Detroit with criminal, alleged criminal activity, and I wanted to make him aware of it before he read it in the paper." Id. at 122.  Hecht testified that during his meeting with Brunwasser, "this new person who had been brought on with Nutter, Joan Markman, was designated to do an investigation from the City of Philadelphia's point of view, of our contract in light of the allegations up in Detroit," and that he "thereafter m[e]t with Ms. Markman." Id. at 128-29.

Synagro claims that "[a]lmost immediately, Markman began focusing her investigation on Hicks and his involvement in the Philadelphia project" and "communicated this focus to William Winning, an attorney then acting on behalf of Synagro." Def.'s Stmt. ¶ 37.  According to Synagro, Markman "stated that she wanted to know how it came about that Hicks had been retained by Synagro, what services he had performed for Synagro, and what he had done with the $30,000 and $25,000 payments he received in January and April 2008." Id. Curiously, Synagro supports these assertions with citations to its own Amended Objections and Responses to Plaintiff's First Set of Interrogatories to

16

Defendant, id. (citing Ex. O to Def.'s Stmt ("Def.'s Resp. to

Interrog.")), apparently on the basis that

> At her deposition, Ms. Markman was asked to
> review Defendant's Amended Interrogatory
> Responses, which describe the contacts
> between representatives of Synagro and
> Markman, and to identify any statements
> contained therein that she believed were
> incomplete or inaccurate.  Other than stating
> that she did not recall some specific dates
> and whether she used a specific phrase
> described in Paragraph 17 of the Amended
> Responses, Markman testified that the
> Responses were accurate, and therefore
> adopted them as her testimony.

Def.'s Mem. in Supp. of Mot. Summ. J. ("Def.'s MSJ Mem.") at 12

n.8 (citing Ex. P to Def.' Stmt. ("Markman Dep.") at 110-112).

It is true that at Markman's deposition Synagro's

counsel presented her with its objections and responses and

suggested that "[a]s you go through, if there's anything in the

paragraph that you are reading that you think is incomplete or

inaccurate, please tell us," Markman Dep. at 111-12.  Markman

expressed concerns about the accuracy of paragraphs 16 through 20

of the objections and responses.  Id. at 112-129.  But Synagro

has pointed to no portion of Markman's testimony in which she

explicitly or affirmatively "adopted [the objections and

responses] as her testimony."  Def.'s MSJ Mem. at 12 n.8.

We distrust Synagro's tactic of ambushing a witness at

17

a deposition with a document, asking the witness if anything in the document is "incomplete or inaccurate," and then suggesting that the witness's failure to challenge a portion of the document means that she has essentially testified in support of it.   In any event, Synagro's own objections and responses simply do not support the claim that "[a]lmost immediately, Markman began focusing her investigation on Hicks and his involvement in the Philadelphia project," Def.'s Stmt. ¶ 37.   Instead, they merely state that Markman "had a lot of questions about the amount of money that Synagro had paid Mr. Hicks, the nature of the services that Mr. Hicks had performed for the money and his qualifications to perform future services described in the Consulting Agreement."   Def.'s Resp. to Interrog. ¶ 4.   We will accordingly reject as unsupported Synagro's assertion that Markman "focus[ed] her investigation on Hicks."   Def.'s Stmt. ¶ 37.

The parties agree, however, that between July 2, 2008 and July 22, 2008, officers and attorneys for Synagro attempted to convene a meeting with Hicks to interview him, and that the scheduled date for the interview was repeatedly postponed. Def.'s Stmt. ¶¶ 38-42; Pl.'s Resp. ¶¶ 38-42.   These communications culminated on July 22, 2008, when Yonette Buchanan ("Buchanan"), Hicks's attorney, wrote to John Kinchen, one of

18

Synagro's attorneys.  Though Buchanan insisted that "Mr. Hicks is willing to be interviewed regarding his employment as a Consultant with Synagro Technologies, Inc.," she explained that "[i]n view of these pending criminal investigations [related to the procurement of contracts by Synagro in Detroit and Philadelphia], and on the advice of counsel, Mr. Hicks declines to be interviewed at this time."  Ex. X to Def.'s Stmt.

A week later, Alvin Thomas, Synagro's general counsel, sent a letter to Buchanan suspending all further payments to Hicks under the Agreement and demanding that Hicks provide Synagro with all documents relating to his work for the company. Def.'s Stmt. ¶ 44; Pl.'s Resp. ¶ 44.  Hicks produced no documents in response to this demand.  But in the course of this litigation Hicks produced emails relating to his activities under the Agreement between him and (1) Reverend Anthony Stevenson ("Stevenson"), a Philadelphia minister, and (2) Jackson.  Def.'s Stmt. ¶¶ 46-47; Pl.'s Resp. ¶¶ 46-47.

Markman interviewed Robert Boucher, Synagro's CEO, on August 8, 2008, and then interviewed Hecht on September 2, 2008. Def.'s Stmt. ¶ 48; Pl.'s Resp. ¶ 48.  Synagro stipulates that

> On or about September 5, 2008, Mr. McDonald
> [an attorney for Synagro] had a telephone
> conversation with Ms. Markman.  Mr. McDonald

19

said that Synagro management was eager to
make sure that Synagro would be awarded the
Contract.  He said that they recognized Ms.
Markman's concerns and that they were willing
to discuss modifying the contract language to
provide the City with a level of comfort
going forward.  Ms. Markman said that it was
interesting that Mr. McDonald mentioned what
he did, because she had talked to
Philadelphia Mayor Michael Nutter about the
very same thing the previous night and that
they were considering two things: a reduction
in the total amount that the City would pay
Synagro on the Contract by the amount of the
payments to Mr. Hicks described in Schedule D
to the Consulting Agreement and the
imposition of specific reporting requirements
with respect to subcontractors retained by
Synagro to perform the Contract.

Ex. T to Def.'s Stmt. ¶ 4(l).  Synagro further stipulates that

On September 17, 2008, Mr. McDonald had a
telephone conference with Ms. Markman during
which Ms. Markman informed Mr. McDonald that
Mayor Nutter had decided to allow the City to
proceed with negotiating the Contract with
Synagro, provided that Synagro accept certain
amendments to the Contract, including a
reduction of the total cost of the Contract
by $400,000 per year and the imposition of
reporting and monitoring requirements
concerning Synagro's subcontractors.

Id. ¶ 4(n).  The parties agree that this reduction in the price

of the Contract corresponded to the amount HHI would be paid had

it performed the services in Schedule D of the Agreement.  They

also agree that this reduction reflected Markman's conviction

that Hicks's services were "'fat in the contract that I didn't

20

want the City to pay for.'"  Def.'s Stmt. ¶ 51 (quoting Markman

Dep. at 114); Pl.'s Resp. ¶ 51.  Markman agreed in her testimony

that no one at Synagro "ever argue[d] with [her] about [her] view

that this was a waste of money" or took "any steps to try and

change [her] mind about this condition that [she was] suggesting

be imposed."  Markman Dep. at 115-16; see also Pl.'s Resp. ¶ 53.

        The parties also agree that the City's changes were

presented to Synagro as non-negotiable, and Synagro understood

that if it did not consent to these changes the City "'wouldn't

approve the Contract.'"  Def.'s Stmt. ¶ 54 (quoting Ex. D to

Def.'s Stmt. at 85-86); Pl.'s Resp. ¶ 54.  The City and Synagro

finally executed the Service Agreement on October 8, 2008.  The

definitive version of this Contract (1) reduced the total value

of the Contract by the amount that HHI could receive under

Amended Schedule D of the Agreement, and (2) provided that

"'Company shall seek and must receive PMA's advanced written

consent to use any particular broker or middle person if such

broker or middle person is not acting in the ordinary course of

his or her bona fide ongoing business concerns in brokering the

services, goods, or equipment.'"  Def.'s Stmt. ¶¶ 55-56 (quoting

Ex. BB to Def.'s Stmt. § 9.4); Pl.'s Resp. ¶¶ 55-56.

        On September 25, 2008, Markman interviewed Hicks, after

she had already met with Boucher, Hecht, Stevenson, and Ahmed.

Def.'s Stmt. ¶¶ 58-59; Pl.'s Resp. ¶¶ 58-59.  In Hicks's

deposition, he described this interview as follows:

> Q:   Did you tell Joan Markman that you gave
>      the $30,000 to Mr. Ashley-Shaw [sic]?
>
> A:   No.
>
> Q:   What did you tell Pam -- Joan Markman
>      you did with the money?
>
> A:   I didn't.  I just shrugged my shoulders.
>
> Q:   All right.  Why didn't you tell her you
>      gave the money to Mr. Ashley-Shaw [sic]?
>
> A:   At that point -- that was probably
>      months later when I met with Markman.
>      At that point, I felt that Joan Markman
>      had it in for me.  When I met with Joan
>      Markman, her main concern was the mayor.
>      Did you give any money to the mayor.
>      Did the mayor take anything, the mayor
>      this, the mayor that.  And what are you
>      doing with a contract like this with
>      Synagro?  You don't know nobody.  Why
>      would Synagro ever pay you?  I mean, she
>      was just belittling me.  So my focus
>      with Joan Markman was to be -- say as
>      less as I can without getting Synagro in
>      trouble or without causing any rifts so
>      the contract can get, you know, executed
>      and we can go on with our life.  So when
>      I met with Markman, I was as evasive as
>      I possibly could [sic].
>
> Q:   You were evasive?
>
> A:   Yes.

Def.'s Stmt. ¶ 60 (quoting Hicks Dep. at 129-131) (emphasis

omitted); Pl.'s Resp. ¶ 60.

For her part, Markman characterized this interview as

follows:

> I don't know that I said that Mr. Hicks said
> that he had kept for himself the money.  That
> certainly was my impression.  And during my
> interview with him, Mr. Hicks suggested it
> very clearly.  Whether he came out and said
> it or if it was a non-nod [sic], wink-wink
> kind of thing, he made very clear to me that
> he was, you know, an operator that was quite
> happy to take Synagro's money. . . . I know
> that -- he did say that he was puffing up his
> involvement and his influence to negotiate
> and get more money from Synagro.

Markman Dept. at 124 (quoted in Def.'s Stmt. ¶¶ 61, 63); Pl.'s

Resp. ¶¶ 61, 63.  Hicks did not mention Ashley-Shah in the

interview.  Def.'s Stmt. ¶ 62; Pl.'s Resp. ¶ 62.  According to

Synagro's attorney, Edward McDonald, "[o]n September 26, 2008,

[he] had a telephone conversation with Ms. Markman in which Ms.

Markman said that she had conducted an interview of Mr. Hicks and

that Mr. Hicks had stated that he had performed community

outreach work for Synagro, but had kept for himself the money

provided to him by Synagro in January and April 2008 for the

purposes of community outreach."  Ex. T to Def.'s Stmt. ¶ 4(p).

On November 6, 2008, McDonald sent a letter to Buchanan

in which he explained on Synagro's behalf that

>We write to inform you and your client,
>Hiram Hicks, that Synagro Technologies, Inc.
>("Synagro" or the "Company") is hereby
>terminating the Consulting Agreement between
>Synagro and Mr. Hicks, dated July 17, 2007,
>and amended on subsequent dates (the
>"Consulting Agreement").  As described in
>detail below, this action is being taken
>because Mr. Hicks breached the Consulting
>Agreement in numerous respects, including (1)
>failing to cooperate with Synagro in its
>review of matters related to its contract to
>reprocess biosolids for the City of
>Philadelphia (the "Philadelphia Contract");
>(2) failing to produce documents to Synagro
>that are the Company's exclusive property;
>and (3) misappropriating $55,000 from
>Synagro.

Ex. DD to Def.'s Stmt. at 1.  On November 21, 2008, Buchanan sent

a letter in response in which she contended that

>Equally groundless is your claim that Mr.
>Hicks stole $55,000 from Synagro.  Mr. Hicks
>submitted two invoices in the amounts of
>$30,000 and $25,000 to Synagro for payment.
>Both invoices described amounts as payments
>for "community outreach services."
>Irrespective of what you believe Mr. Hicks
>may have told Ms. Markman, Synagro was and is
>fully aware of what Mr. Hicks did with those
>funds.  Indeed, it was Synagro, at its
>highest levels of management, that directed
>that use.  Any contention that Mr. Hicks
>misled Synagro as to the use of these funds
>is disingenuous at the least.

Ex. EE to Def.'s Stmt. at 4 (emphasis in original).

24

## III. **<u>The Parties' Motions For Summary Judgment</u>**

On a motion for summary judgment, "[t]he moving party
first must show that no genuine issue of material fact exists,"
<u>Adderly v. Ferrier</u>, 419 Fed. Appx. 135, 136 (3d Cir. 2011)
(citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)),
whereupon "[t]he burden then shifts to the non-moving party to
set forth specific facts demonstrating a genuine issue for
trial."  <u>Id.</u>  "'A disputed fact is "material" if it would affect
the outcome of the suit as determined by the substantive law,'"
<u>J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.</u>, 650 F.3d 915,
925 (3d Cir. 2011) (quoting <u>Gray v. York Newspapers, Inc.</u>, 957
F.2d 1070, 1078 (3d Cir. 1992)), while a factual dispute is
genuine "'if the evidence is such that a reasonable jury could
return a verdict for the nonmoving party. . . . The mere
existence of a scintilla of evidence in support of the
plaintiff's position will be insufficient; there must be
significantly probative evidence on which the jury could
reasonably find for the plaintiff."  <u>Bialko v. Quaker Oats Co.</u>,
434 Fed. Appx. 139, 141 n.4 (3d Cir. 2011) (quoting <u>Anderson v.
Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986)) (brackets
omitted).  We "draw all reasonable inferences in favor of the
nonmoving party, and [we] may not make credibility determinations

or weigh the evidence." <u>Eisenberry v. Shaw Bros.</u>, 421 Fed. Appx.

239, 241 (3d Cir. 2011) (quotation marks omitted).

### A.   **Expiration Of The Agreement**

In response to HHI's claim for breach of contract,

Synagro focuses on language from § 1 of the Agreement providing

that "[t]he Consulting Services and Compensation provided for

under this Agreement shall expire on June 30, 2008, if the

Contract with the City is not approved by this date, unless

extended by mutual agreement."  Synagro argues that "Plaintiff

cannot satisfy the first element of its claim -- the existence of

a valid contract at the time of the alleged breach -- because the

Consulting Agreement, by its plain terms, expired on June 30,

2008, prior to the vesting of Plaintiff's alleged entitlement to

the amounts it seeks to recover in this case."  Def.'s MSJ Mem.

at 19.  According to Synagro, "the 'Contract with the City' is

not the same as the 'bills' authorizing the negotiation of that

contract.  Further, 'approval' of the Contract by the City

unquestionably involves far more than just passage of bills by

the City Council."  <u>Id.</u> at 20.  Synagro thus contends that the

Agreement expired on June 30, 2008 because

> It is undisputed that it was not until, at
> the earliest, mid-September 2008, when

26

>Markman concluded her investigation
>concerning Synagro and Hiriam Hicks, that
>Philadelphia Mayor Michael Nutter authorized
>the City to proceed with finalizing a
>contract with Synagro.  Even then, the
>Mayor's authorization to finalize the
>Contract did not amount to 'approval' by the
>City.  The final language of the Contract
>still had to be negotiated between Synagro
>and the City Solicitor's office and approved
>by the necessary officials in the Mayor's
>office and the relevant executive
>departments.  The City's final Contract with
>Synagro was not signed until October 8, 2008.

Id. at 22 (citations omitted).

HHI responds that "[t]he only reasonable reading of

Section 1 of the Consulting Agreement is that obtaining City

Council approval of the bills prior to June 30, 2008 was all that

was required on Hicks' part.  There is no disagreement that the

City Council subcommittees and full council gave their approvals

prior to June 30, 2008."  Pl.'s Mem. in Supp. of Mot. Summ. J.

("Pl.'s MSJ Mem.") at 11.  HHI thus contends that "Plaintiff is

entitled to partial summary judgment that his right to provide

services, and be paid, under Amended Schedule D of his Consulting

Agreement has not 'expired' as that term is defined in Section 1

of the Agreement because the requisite 'approval' of the City

Council was timely obtained."  Id.

Pennsylvania law provides that

27

> When the words of a contract are clear and
> unambiguous, the intent of the parties is to
> be discovered from the express language of
> the agreement.  However, where an ambiguity
> exists, courts are free to construe the
> ambiguity against the drafter.  Moreover, it
> is the function of the court to decide, as a
> matter of law, whether the contract terms are
> clear or ambiguous.

Bucks Orthopaedic Surgery Assocs., P.C. v. Ruth, 925 A.2d 868,

872 (Pa. Super. 2007) (citations omitted).  Synagro and HHI's

interpretive dispute revolves around § 1 of the Agreement.  We

must therefore interpret the phrase "if the Contract with the

City is not approved."  Agreement § 1.

Essentially, Synagro urges that this phrase cannot mean

"if bills authorizing the Contract with the City are not passed

by City Council".  Instead, Synagro contends that

> Throughout the Consulting Agreement, when
> Plaintiff and Synagro sought to condition an
> event or entitlement on the passage of a bill
> by the City Council, they explicitly said so.
> Specifically, both Schedule B and Schedule C
> refer specifically to "passage" of "bills" by
> the City Council.  Given this specificity in
> other parts of the Agreement, if the parties
> intended in Section 1 to require only action
> by the City Council, they would have made
> explicit reference to the passage of bills by
> the Council.  Instead, the parties chose to
> condition survival of the Agreement on
> approval of the 'Contract' (i.e., the actual
> document ultimately signed by the City and
> Synagro) by the 'City' as a whole (i.e., all
> of the branches involved with the Contract,

28

including the Mayor's office.

Def.'s MSJ Mem. at 22-23.  We first note that Synagro misrepresents the language of § 1.  Nowhere does it condition the survival of the Agreement on approval of the Contract "by the 'City' as a whole."[5]  Id.

Synagro's arguments respecting the parties' explicit references elsewhere in the Agreement to "the passage of bills by the Council" appear appealing at first glance.  It is true that "[c]ourts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed," Murphy v. Duquesne Univ. of the Holy Ghost, 777 A.2d 418, 429 (Pa. 2001).  Thus, the use of specific language to denote a particular meaning in one part of a Contract may give rise to the inference that if such language is absent elsewhere in a Contract then that meaning is not intended.

But an even more foundational tenet of contract interpretation is that a "contract is to be considered as a whole," J.E. Faltin Motor Transp., Inc. v. Eazor Exp., Inc., 273

---

[5] Indeed, Section 1 of the Agreement is silent as to who must approve the Contract -- though, as our analysis below demonstrates, it incorporates by reference Schedules that make clear that the approving entity in question is City Council.

F.2d 444, 445 (3d Cir. 1960) (summarizing basic contract

principles).  As a result, courts should "adopt that sense of the

word which best harmonizes with the context."  Reilly v. City

Deposit Bank & Trust Co., 185 A. 620, 623 (Pa. 1936).  The

provisions of the Contract to which Synagro cites -- Schedule B

and Schedule C -- provide the context in which we must interpret

this phrase.  These Schedules are, after all, explicitly

incorporated into § 1 of the Agreement.

> As we have noted, § 1 of the Agreement provides that:

> > Consulting Services.  The Company hereby
> > retains Consultant as a consultant reporting
> > to the Vice President Business Development
> > [sic] to provide the advice and services for
> > the Company described in Schedule B (the
> > 'Consulting Services'). . . . The Consulting
> > Services and Compensation provided for under
> > this Agreement shall expire on June 30, 2008,
> > if the Contract with the City is not approved
> > by this date, unless extended by mutual
> > agreement. . . .

Schedule B describes the "Consulting Services" as follows:

> Part 1.    Government and Community relations services
> in connection with the City of Philadelphia
> Biosolids Management Facility project through
> both Subcommittee's [sic] passage for:
>
> Bill 060108, to authorize the Water
> Department and the Procurement
> Department to enter into a Service
> Contract for biosolids services with the
> Philadelphia Municipal authority (PMA);

Bill 060109, to extend the term of the
PMA and authorize it to design, build,
finance, own, operate, maintain, and
lease facilities to provide biosolids
services to the City; and

Part 2.   Government and Community relations services
in connection with the City of Philadelphia
Biosolids Management Facility project through
full City Council passage for the two bills
as shown above.

Part 3[.] If these two bills are successfully voted out
of both Sub Committees and obtain full City
Council approval, then additional government
and community relations and subcontracting
(See Schedule D) services.

And Schedule C describes "Compensation":

Part 1.   Work on passage of Bills through
both Subcommittees:                    $5,000/month

Part [2]   Upon passage of Bills through both
Subcommittees, work on passage of
Bills through full City Council:       $5,000/month

Part 3.   Retainer at Contract execution:      $80,000

Upon passage of Bills through full
City Council, services to assist:

- Contract finalization, and

- 90 day mobilization for start-up
operations . . .

Schedule B describes the services that HHI was to

provide to Synagro.  Of these services, two specifically concern

the passage of two bills through City Council, while the third

conditions HHI's right to provide "additional government and

31

community relations and subcontracting (See Schedule D) services"
upon whether "these two bills are successfully voted out of both
Sub Committees and obtain full City Council approval."  Schedule
C describes the compensation HHI was to receive.  Of this
compensation, two types were in exchange for "work on passage of
Bills," while the third was conditioned upon the exchange of
services following "passage of Bills through full City Council."

     Section 1 of the Agreement thus incorporates by
reference a set of services and compensation that was yoked to
the passage of two bills by City Council.  To be sure, some
services (and compensation therefor) were linked to securing
passage, while others were conditioned upon whether this passage
had indeed occurred.  As a matter of structure, the condition
described in Section 1  -- "[t]he Consulting Services and
Compensation provided for under this Agreement shall expire on
June 30, 2008, if the Contract with the City is not approved by
this date" -- would seem most naturally to be triggered by
passage of these bills.

     This conclusion is rendered inescapable by two
additional clauses from Schedule B that clarify what Section 1
means by "if the Contract with the City is not approved."  Of the
two bills HHI was tasked with moving through City Council,

32

Schedule B describes one as a bill "to authorize the Water Department and the Procurement Department to enter into a Service Contract for biosolids services with the Philadelphia Municipal authority (PMA)."  Schedule B then describes the process whereby these bills pass through City Council: "these two bills are successfully voted out of both Sub Committees and obtain full City Council approval."  Schedule B thus envisions that HHI would provide "additional government and community relations and subcontracting (See Schedule D) services" only if two bills "obtain full City Council approval," one of which must "authorize the Water Department and the Procurement Department to enter into a Service Contract."  Given that <u>approve</u> means "[t]o give formal sanction to; to confirm authoritatively," <u>Black's Law Dictionary</u> 118 (9th ed. 2009), there is little doubt that "full City Council approval" of a bill "authoriz[ing] the Water Department and the Procurement Department to enter into a Service Contract" must mean approval of such a Contract.[6]  And since the critical

---

[6] For this reason, we reject Synagro's suggestion that "the City Council's passage of the primary bill in this matter did not amount to 'approval' of a contract between Synagro and the City . . . . the terms of which had not even been fully negotiated and finalized by the parties, and from which, as Hicks admitted, the Mayor could have simply walked away at any time."  Def.'s Resp. to Pl.'s MSJ at 5 (citations omitted).  Passage of a bill authorizing the Contract <u>did</u> constitute "approval" of the

sentence of § 1 explicitly incorporates the consulting services described in Schedule B, the locution "if the Contract with the City is not approved" must refer to whether City Council had actually approved a bill authorizing the Contract.

Another approach confirms how § 1 requires this result.  If one substitutes the referenced language from Schedule B into the sentence from § 1 that we are interpreting, the substitution converts "[t]he Consulting Services and Compensation provided for under this Agreement shall expire on June 30, 2008, if the Contract with the City is not approved by this date" into the following language:

> The Consulting Services and Compensation provided for under this Agreement -- including, <u>inter</u> <u>alia</u>, additional government and community relations and subcontracting services to be provided if two bills are successfully voted out of both Sub Committees and obtain full City Council approval, including a bill authorizing the Water Department and the Procurement Department to enter into a Service Contract for biosolids services with the Philadelphia Municipal authority (PMA) -- shall expire on June 30, 2008, if the Contract with the City is not

---

Contract by City Council, even if this approval did not represent a final commitment by all of City government.  We note, moreover, that <u>final</u> and <u>irrevocable</u> approval would appear to require execution of the Contract; even Synagro "does not contend that approval of the Contract required that the City actually put pen to paper before June 30, 2008."  <u>Id.</u>

approved by this date.

Reading this hypothesized passage makes clear that "if the Contract with the City is not approved" can only refer to the passage by City Council of a bill authorizing the City to enter into a Service Contract with PMA.

Because the meaning of this provision is unambiguous, we need not consider extrinsic evidence respecting the Agreement's formation.  The parties agree that City Council passed a bill before June 30, 2008 authorizing the City to enter into a Service Agreement with the PMA.  We will consequently deny Synagro's motion for summary judgment with respect to HHI's breach of contract claim, and grant HHI's motion for partial summary judgment.

### B.   Hicks's Alleged Material Breaches Of The Agreement

Synagro does not rely solely upon its claim that the Agreement expired on June 30, 2008.  It also asserts that even if the Agreement survived this date, HHI's multiple material breaches justified Synagro's termination of the Agreement.  Def.'s MSJ Mem. at 2-3.  HHI responds that not only did it not breach the Agreement, but that none of the claimed breaches are

35

material.[7]  Pl.'s Resp. to Def.'s MSJ at 14.

Pennsylvania courts have "long recognized the established precept of contract law that a material breach of a contract relieves the non-breaching party from any continuing duty of performance thereunder." LJL Transp., Inc. v. Pilot Air Freight Corp., 962 A.2d 639, 648 (Pa. 2009).  As the Superior Court of Pennsylvania has explained, "[w]hether a breach is so substantial as to justify an injured party's regarding the whole transaction as at an end 'is a question of degree; and must be answered by weighing the consequences in the actual custom of men in the performance of contracts similar to the one that is involved in the specific case.'" 2401 Pennsylvania Ave. Corp. v. Fed'n of Jewish Agencies of Greater Phila., 466 A.2d 132, 139 (Pa. Super. 1983) (quoting 4 Corbin, Contracts, § 946 (1951)).

---

[7] Indeed, HHI suggests that "[a] searching review of the record shows that each defense is so utterly lacking in any evidentiary support that the Court sua sponte may dismiss each of them as a matter of law." Pl.'s Resp. to Def.'s MSJ at 15.  Our Court of Appeals has explained that "[w]hile there are three different grounds on which we could recognize an exception to the notice requirement in the case of sua sponte summary judgment -- the presence of a fully developed record, the lack of prejudice, or a decision based on a purely legal issue -- we need not decide if fewer than all three would suffice as all three are present in the case at bar." Gibson v.Mayor & Council of City of Wilmington, 355 F.3d 215, 224 (3d Cir. 2004).  Inasmuch as the latter two of these three grounds are not present here, we decline HHI's invitation to dismiss Synagro's proffered defenses.

We will consider each of Synagro's assertions regarding HHI's

alleged breaches of the Agreement.

> ### i.   Hicks's Interview With Markman

>> According to Synagro,

>> Hiriam Hicks conceded at his deposition that
>> when he met with Joan Markman on September
>> 25, 2008, he was 'as evasive as [he] possible
>> could [sic],' and that he refused to tell
>> Markman what he did with the $55,000 that
>> Synagro gave him for community outreach.
>> Hicks's conduct reasonably led Markman to
>> believe that Hicks kept the money for
>> himself.  This inappropriate conduct
>> constituted a clear breach of Plaintiff's
>> obligations under Sections 1 and 7 of the
>> Agreement.

Def.'s MSJ Mem. at 26 (bracketed material in Def.'s MSJ Mem.)

(citations omitted).  Synagro continues:

>> Markman also testified that Hicks conveyed to
>> her that he was an 'operator that was quite
>> happy to take Synagro's money.'  Indeed, he
>> explicitly told her that, in dealing with
>> Synagro, 'he was puffing up his involvement
>> and his influence to negotiate and get more
>> money from Synagro.'  Given the amount of
>> responsibility that Synagro gave to Hicks in
>> connection with the company's efforts to
>> obtain the Philadelphia Contract, and the
>> amount of money that Synagro proposed to pay
>> under Schedule D, for Hicks to reveal himself
>> as untrustworthy and unqualified could not
>> help but cast Synagro in a poor light.
>> Further injuring Synagro's business
>> reputation was Hicks's extended delay in
>> agreeing to meet with Markman. . . . Indeed,

> Hicks's conduct convinced the City that its
> deal with Synagro was worth $9.2 million less
> than it had previously believed.

Id. at 27 (citations omitted) (emphasis in original).

HHI responds that "[t]he evidence is absolutely clear
that the City had decided to reduce the contract by this amount
[$9.2 million] well before Hicks ever met Markman," Pl.'s Resp.
to Def.'s MSJ at 16-17, and that even if "Hicks hurt his own
reputation with Markman . . . there has not been the slightest
showing of any adverse consequences to Synagro's goodwill or
business reputation." Id. at 17. HHI further suggests -- in a
vivid turn of phrase -- that "when Hicks was interviewed, Synagro
had long been the subject of new [sic] coverage regarding the
bribery investigation in Detroit. As far as the evidence shows,
Hick's [sic] lack of cooperation in an informal private interview
had the same impact on the public perception of Synagro as the
impact on the Atlantic Ocean from the shedding of one single,
salty tear." Id. at 6 (citation omitted).

Section 1 of the Agreement provides in relevant part
that "[t]he Consultant shall not engage in any conduct or make
any statement, which in the reasonable opinion of the Company,
would be deleterious to the good will or would injure the
business reputation of the Company or corporations affiliated

38

with the Company."  For its part, § 7 states that "[a]t all times during the Consulting Term and thereafter, Consultant and the Company will make only positive comments about each other, its affiliates, directors, officers, employees and agents, and shall make no comments or take any other actions, direct or indirect, that will reflect adversely on any of the foregoing or adversely affect their business reputation or goodwill."

HHI correctly notes that Synagro has pointed to <u>no</u> evidence that Hicks's conduct during his interview with Markman was "deleterious to the good will" of Synagro, "injure[d] the business reputation of the Company," or "reflect[ed] adversely on any of the foregoing or adversely affect[ed] their business reputation or goodwill."  As HHI notes, Hicks's behavior may have harmed his own reputation (such as it was) in the eyes of Markman, a seasoned former federal prosecutor, but we have seen no evidence that it tarnished Synagro's reputation or goodwill.[8] To the extent the City chose to renegotiate its Contract with

_____

[8] Synagro's claim appears predicated on the theory that whenever an individual injures his own reputation, he necessarily injures the reputation of anyone associated with him.  We deny Synagro's motion because it fails to substantiate its claims of injury.  We emphasize, however, that we are skeptical that such a "guilt by association" claim violates Sections 1 and 7 of the Agreement, since such an interpretation would likely render these provisions impermissibly vague and overbroad.

Synagro because of Hicks's interview conduct -- a dubious
proposition given that Synagro and the City began discussing
reducing the Contract amount on September 5, 2008 and Markman
interviewed Hicks twenty days <u>later</u> -- Synagro has presented
evidence only that these renegotiations were prompted by the
City's low estimation of Hicks's utility, not because of any
bruise to Synagro's goodwill or reputation (such as it was).  We
will accordingly deny Synagro's motion for summary judgment to
the extent it is based on HHI's alleged breaches of Sections 1
and 7 of the Agreement.

### ii.  <u>Synagro's Request To Interview Hicks</u>

Synagro next argues that HHI breached its obligations
under § 7 by failing "to reasonably assist [Synagro] at any time
in the future, with respect to all reasonable requests to testify
in connection with any legal proceeding or matter relating to the
[<u>sic</u>] each other, including but not limited to any federal, state
or local audit, proceeding or investigation, other than
proceedings relating to the enforcement of this Agreement."
Agreement § 7.  Synagro suggests that its "request that Hicks
meet with the company's attorneys for the purpose of providing
information or evidence concerning his activities on behalf of

Synagro constituted a 'request to testify' within the meaning of Section 7," Def.'s MSJ Mem. at 28-29, and further argues that "Markman's request to meet with Hicks unquestionably constituted a request that he 'testify,' i.e., that he given [sic] evidence as a witness."  Id. at 30.

HHI responds that "the everyday meaning of ['testify'], and what Mr. Hicks understood the word to convey, is being sworn formally as a witness to 'testify' under oath," Pl.'s Resp. to Def.'s MSJ at 18.  In support, HHI cites the Fifth Edition of Black's Law Dictionary.  Synagro maintains that "[t]he primary definition of the term 'testify' is 'to give evidence as a witness,'" Def.'s MSJ Mem. at 28, citing the Ninth Edition of Black's Law Dictionary.  Synagro also argues that "[c]onfirming that Plaintiff's duty to cooperate was not limited to providing a statement under oath is the fact that Section 7 applies not only to 'legal proceedings,' but also to 'matters' generally, and that the obligation extends beyond formal hearings to cooperation in connection with 'investigations,' and even 'audits.'"  Id. at 28.

Accepting Synagro's definition of testify -- and its favored source -- does not resolve our definitional dilemma, since to make sense of the definition of testify we must determine what a witness is.  According to Synagro's favored

41

dictionary, the term may be defined in two ways: (1) "[o]ne who sees, knows, or vouches for something," or (2) "[o]ne who gives testimony under oath or affirmation (1) in person, (2) by oral or written deposition, or (3) by affidavit." Black's Law Dictionary 1740 (9th ed. 2009). Given the ambiguity of this term, we must construe the provision against the draftsman,[9] so that HHI's preferred meaning prevails -- suggesting that testify means "to give evidence as a witness," where a witness is "one who gives testimony under oath or affirmation."

        Synagro's objection to applying this definition in context also fails given that a witness may offer evidence under oath or affirmation in connection with a proceeding, investigation, or audit. Since neither Synagro nor Markman requested that Hicks provide testimony under oath or affirmation, his refusal or delay to do so cannot have violated § 7 of the Agreement.

        But Synagro has another argument on this subject: that

---

        [9] In ruling on a motion for summary judgment, we accept facts that the non-movant supports with specific citations to the record and draw inferences in the non-movant's favor. See, e.g., Proctor v. Sagamore Big Game Club, 265 F.3d 196, 198 (3d Cir. 1959). Because Hicks affirms that Synagro drafted the Agreement with the exception of certain changes to § 1 and Schedule B, we accept this fact for the purposes of ruling on Synagro's motion.

"[r]egardless of the proper interpretation of the term 'testify,'

Synagro's termination of the Consulting Agreement was also proper

because, as an agent of Synagro, Hicks possessed a common law

obligation to provide Synagro with information concerning his

activities."  Def.'s MSJ Mem. at 30.   HHI responds that

> Since the Consulting Agreement specifies the
> narrow area in which Hicks is required to
> give information (only when asked to
> reasonably assist in providing testimony),
> the broader common law duty embodied in § 381
> is displaced by the contractual language to
> which the parties 'otherwise agreed.'
> Furthermore, even the common law rule
> requires only 'reasonable efforts' to provide
> information.  For the reasons set forth
> above, it was not 'reasonable' under the
> circumstances for Synagro's attorneys to
> demand an interview 'at that time,' until
> their good faith and the federal prosecutor's
> intentions could be divined.

Pl.'s Resp. to Def.'s MSJ at 22.

It is true that Restatement (Second) of Agency § 381

provides that "[u]nless otherwise agreed, an agent is subject to

a duty to use reasonable efforts to give his principal

information which is relevant to affairs entrusted to him and

which, as the agent has notice, the principal would desire to

have and which can be communicated without violating a superior

duty to a third person" -- though we have found few cases in

which Pennsylvania courts adopted or applied this section.   <u>See</u>

43

Ward v. Torchia, 2000 WL 33311531 (Pa. Comm. Pl. 2000); Lang v. Anton, 1983 WL 1498 (Pa. Comm. Pl. 1983). In any event, Pennsylvania law makes clear that "[a]gency is the relationship which results from (1) the manifestation of consent of one person to another that (2) the other shall act on his behalf and subject to his control, and (3) consent by the other so to act," and that "[s]uch agency results only if there is an agreement for the creation of a fiduciary relationship with control by the beneficiary." Smalich v. Westfall, 269 A.2d 476, 480 (Pa. 1970). As the Superior Court of Pennsylvania has emphasized,

> This does not mean, however, that a fiduciary relationship arises merely because one party relies on and pays for the specialized skill or expertise of the other party. Otherwise, a fiduciary relationship would arise whenever one party had any marginally greater level of skill and expertise in a particular area than another party. Rather, the critical question is whether the relationship goes <u>beyond</u> mere reliance on superior skill, and into a relationship characterized by "over-mastering influence" on one side or "weakness, dependence, or trust, justifiably reposed" on the other side.

eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 23 (Pa. Super. 2002) (emphasis in original) (quoting Basile v. H & R Block, 777 A.2d 95, 101 (Pa. Super. 2001); see also Valley Forge Convention & Visitors Bureau v. Visitor's Servs., 28 F. Supp. 2d

44

947, 953 (E.D. Pa. 1998) (Waldman, J.) ("There is a crucial distinction between surrendering control of one's affairs to a fiduciary or confidant or party in a position to exercise undue influence and entering an arms length commercial agreement, however important its performance may be to the success of one's business.").

Without reaching HHI's contentions that (1) Section 7 of the Agreement displaced any common-law duty it might have to inform Synagro, and (2) any request from Synagro to interview Hicks was unreasonable, it is evident that Synagro has not demonstrated that HHI acted as its fiduciary and agent. The mere existence of a contract for services between HHI and Synagro does not, by itself, make the law of agency applicable to HHI. Because we have no basis for applying § 381 to HHI, we will reject Synagro's claim that HHI violated its common law duty to inform by refusing to meet with Synagro's officers for an interview.

We therefore deny Synagro's motion for summary judgment to the extent it is predicated upon HHI's alleged breach of § 7 of the Agreement and Restatement (Second) of Agency § 381.

### iii. **Equitable Estoppel And Hicks's Use Of The $55,000**

Synagro next argues that

> Hicks made statements to Markman that led
> Synagro reasonably to believe that he
> admitted that he had kept for himself money
> that Synagro had given him for the purpose of
> making donations and expenditures to secure
> community support for Synagro's BRC proposal.
> For more than two and a half years, Hicks
> never denied that he had made those
> statements (indeed, he does not dispute that
> he did); nor did he tell Synagro that those
> statements were inaccurate.  Under these
> circumstances, it would be inequitable for
> Hicks to now contend that he did not
> misappropriate the money and thereby breach
> the Consulting Agreement.

Def.'s MSJ Mem. at 33 (emphasis in original).  Since Synagro

contends that "[t]here is no question that if Hicks had

misappropriated the $55,000 that Synagro gave him, Synagro would

be justified in terminating the Agreement," id. at 32, it argues

that HHI is estopped from challenging this termination.

Under Pennsylvania law, "[t]he two essential elements

of equitable estoppel are inducement and justifiable reliance on

that inducement.  The inducement may be words or conduct and the

acts that are induced may be by commission or forbearance

provided that a change in condition results causing disadvantage

to the one induced."  Novelty Knitting Mills, Inc. v. Siskind,

457 A.2d 502, 503-04 (Pa. 1983) (citations omitted).  But "[t]he

46

flexibility of the doctrine of equitable estoppel does not allow it to be imposed where the essential elements of inducement and reliance are supported solely by speculation," id. at 505; "the burden rests on the party asserting the estoppel to establish such estoppel by clear, precise and unequivocal evidence," Blofsen v. Cutaiar, 333 A.2d 841, 844 (Pa. 1975), and "there can be no estoppel where a complainant's act or forbearance is caused by his own mistaken judgment." Havas v. Temple Univ. of Com. Sys. of Higher Educ., 516 A.2d 17, 20 (Pa. Super. 1986).

As Synagro concedes, Markman testified that

> I don't know that I said that Mr. Hicks said that he had kept for himself the money. That certainly was my impression. And during my interview with him, Mr. Hicks suggested it very clearly. Whether he came out and said it or if it was a non-nod [sic], wink-wink kind of thing, he made very clear to me that he was, you know, an operator that was quite happy to take Synagro's money.

Markman Dep. at 124 (quoted in Def.'s Stmt. ¶ 61). Synagro also quotes the following testimony from Hicks's deposition:

> Q:   What did you tell Pam -- Joan Markman you did with the money?
>
> A:   I didn't.  I just shrugged my shoulders.

Def.'s Stmt. ¶ 60 (quoting Hicks Dep. at 129-131). Finally, Synagro presents as an exhibit a November 21, 2008 letter from

47

Buchanan, Hicks's lawyer, in which she characterizes as "[e]qually groundless . . . your claim that Mr. Hicks stole $55,000 from Synagro."  Ex. EE to Def.'s Stmt. at 4.

The gravamen of Synagro's argument thus seems to be that (1) Hicks shrugged, winked, or nodded in response to Markman's questions about what he did with the $55,000 Synagro entrusted to him; (2) Markman inferred from these gestures that Hicks kept this money for himself; and (3) when Synagro confronted Hicks with this accusation, he denied it.  It is hard for us to imagine weaker grounds for equitable estoppel than a rumored gesture, perceived second-hand, whose presumed import was denied at the first opportunity by its maker.  Because Synagro cannot reasonably rely upon Hicks's equivocal gestures to conclude that he stole $55,000, we will deny its motion for summary judgment to the extent that it depends upon what Hicks allegedly did with the $55,000 Synagro entrusted to him.[10]

---

[10] With respect to this $55,000, Synagro also argues that "Plaintiff's explanation of what it did with the $55,000 entrusted to it by Synagro for community outreach has been a moving target.  First, Hiriam Hicks told Pamela Racey that he donated the money to three recipients: Reverend Anthony Stevenson, United Resources Center and Four Corners.  Several months later, Hicks conveyed to Markman that he simply kept the money for himself.  Finally, in this litigation, a new story emerged: that Hicks gave the entire $55,000 in cash to Sultan Ashley-Shah.  By failing to be truthful with Pamela Racey and

### iv.  **Synagro's Request For Documents**

The final material breach that Synagro alleges is that Hicks failed to respond to a request from Synagro for documents pursuant to § 5 of the Agreement, although he later produced six hundred pages of documents relating to the Agreement and his activities on behalf of Synagro, including emails between Hicks and Stevenson and Jackson relating to those activities.  Def.'s MSJ Mem. at 34.  HHI denies that these emails qualify as "documents" under § 5, arguing that "[a]s the context makes clear, section 5 merely requires HHI to return to Synagro its 'own property' -- hard-copies of confidential business records, containing 'secretive and competitive' information, which information was, and was to remain, the 'exclusive property' of

---

Synagro (not to mention Joan Markman), Plaintiff breached its contractual and common law agency obligations."  Def.'s MSJ Mem. at 36-37.  In response, "Hicks denies that he told Pam Racey that he gave the money to Rev. Stevenson.  Giving her the benefit of the doubt, Racey appears to have confused the fact that Hicks told her about Rev. Stevenson, and that Rev. Stevenson in fact did appear at the hearing, along with members of his community, with what she had been told about who it was Hicks had given the money to."  Pl.'s Resp. to Def.'s MSJ at 31 (citing Hicks Decl. ¶ 37-38).  Inasmuch as (1) there is an issue of fact as to what Hicks told Racey about his use of the $55,000, and (2) Hicks appears only to have made equivocal gestures to Markman regarding this $55,000, we will deny Synagro's motion for summary judgment without reaching the question of whether Hicks's allegedly shifting stories violated any contractual or common law duty.

Synagro, and to be returned upon request."  Pl.'s Resp. to Def.'s

MSJ at 29 (quoting Agreement § 5).

      Section 5 of the Agreement provides as follows:

> <u>Business Records</u>.  Given the secretive and
> competitive environment in which the Company
> does business and the relationship that
> Consultant shall have with the Company
> hereunder, Consultant agrees to deliver
> promptly to the Company, upon termination of
> the Consulting Term, or at any other time
> when the Company so requests, all memoranda,
> notes, records, drawings, manuals, and other
> documents (and all copies thereof and
> therefrom) in any way relating to the
> business or affairs of the Company or any of
> its affiliates, members, officers, partners
> or subsidiaries or any of their clients,
> whether made or compiled by Consultant or
> furnished to him by the Company or any of its
> officers, employees, customers, clients,
> consultants, or agents, which Consultant may
> then possess or have under his control.
> Consultant confirms that all such memoranda,
> notes, records, drawings, manuals, and other
> documents (and all copies thereof and
> therefrom) constitute the exclusive property
> of the Company.  The obligation of
> confidentiality set forth in Section 4 shall
> continue notwithstanding Consultant's
> delivery of any such documents of the
> Company.

According to Synagro's preferred dictionary, a <u>document</u> is

"[s]omething tangible on which words, symbols, or marks are

recorded," <u>Black's Law Dictionary</u> 555 (9th ed. 2009), where

<u>tangible</u> means "[h]aving or possessing physical form; CORPOREAL."

Id. at 1592.  Notwithstanding Synagro's protestation that "[i]n this day of ubiquitous electronic communication, it is simply not reasonable for Hicks to claim that his obligation to provide 'documents' only applied to 'hard-copy' documents," Def.'s Reply at 5, the plain meaning of the contract Synagro drafted includes only physical documents within Section 5's ambit.  See Fischer & Porter Co. v. Porter, 72 A.2d 98, 101 (Pa. 1950) ("It is fundamental that 'Technical terms and words of art are [to be] given their technical meaning unless the context or a usage which is applicable indicates a different meaning.'  And this rule is especially applicable where the words of art used are legal terms.") (brackets in Fischer & Porter Co.) (citation omitted).

Hicks's failure to turn over emails relating to his activities on behalf of Synagro thus did not breach § 5 of the Agreement.  We will accordingly deny Synagro's motion for summary judgment to the extent it rests on this basis.

C.  **Frustration Of Purpose And The Contract**

Synagro's final argument in opposition to HHI's breach of contract claim is that the City's renegotiation of the Contract frustrated the purpose of the Agreement with HHI:

> As a result of her investigation concerning
> Hicks's involvement with Synagro's activities

51

> in Philadelphia, Joan Markman 'insisted' on a
> number of extremely significant changes to
> the Philadelphia Contract. . . . The City's
> insistence on these changes as a condition to
> allowing the Philadelphia Contract to proceed
> fundamentally altered the assumptions upon
> which the Consulting Agreement was based,
> i.e., that the amounts to be paid to
> Plaintiff would be covered by the total fee
> Synagro received from the City, and that
> Plaintiff would actually be permitted to
> perform services on behalf of Synagro in
> connection with the biosolids reprocessing
> project.  When these two pillars of the
> Consulting Agreement were destroyed, the
> purpose of the Agreement was frustrated; and
> Synagro was relieved from its obligations
> under the Agreement.

Def.'s MSJ Mem. at 39-40.  As Synagro notes, the definitive

Service Contract between PMA and PBS explicitly provided that the

fixed dewatering/utilization and fixed operating charges -- which

together would have equalled $2,184,986 per month, or $26,219,832

per year -- "shall be reduced by $33,333.33 per Billing Period,"

Ex. BB to Def.'s Stmt. ("Service Contract") §§ 8.2.B(1), 8.3(4),

four cents short of $400,000 per year.  Section 9.4(A) of the

Service Contract further provided that

> Company may utilize brokers or middle persons
> to arrange for services, goods and equipment
> in furtherance of this Agreement; however,
> Company shall seek and must receive PMA's
> advance written consent to use any particular
> broker or middle person if such broker or
> middle person is not acting in the ordinary
> course of his or her bona fide ongoing

business concerns in brokering the services, goods or equipment.

Pennsylvania has adopted the Restatement (Second) of Contracts, which provides that "[w]here, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary." Restatement (Second) of Contracts § 265 (1981) (quoted in Step Plan Servs., Inc. v. Koresko, 12 A.3d 401 (Pa. Super. 2010)). The commentary to §265 elaborates that

> First, the purpose that is frustrated must have been a principal purpose of that party in making the contract. It is not enough that he had in mind some specific object without which he would not have made the contract. The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense. Second, the frustration must be substantial. It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract. Third, the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made.

53

Comment a to id. (quoted in Step Plan Servs., 12 A.3d at 413).

As the Superior Court of Pennsylvania has explained, "a court can

excuse performance under a contract upon the occurrence of a

truly unexpected event that thwarts the purpose or performance of

a contract," Step Plan Servs., 12 A.3d at 412, though "if the

allegedly unforeseeable event was in reality a natural and fairly

predictable risk arising in the normal course of business, then a

court may not dissolve a[n] . . . agreement." Id.

        With this authority in mind, we may reject Synagro's

first proffered "pillar" of the Agreement: the fact that the City

reduced Synagro's yearly payout under the Service Contract by

four cents short of $400,000, leaving Synagro unable to pass the

costs of HHI's services on to the City, does not frustrate the

purpose of the Agreement.  As the Restatement emphasizes, "[i]t

is not enough that the transaction has become less profitable for

the affected party or even that he will sustain a loss."  Comment

a to Restatement (Second) of Contracts § 265.

        The second "pillar" presents a closer question.  Though

HHI contends "that the principal purpose of the Consulting

Agreement was the retention of Hicks to obtain the City Council's

approval of the Contract in the City Council," Pl.'s Resp. to

Def.'s MSJ at 35, it appears that Section D, at least, had as its

54

purpose securing certain consulting and subcontracting services
from HHI for Synagro.  But even if we assume this is true, it is
not apparent from the record that the City's renegotiation of the
Contract <u>frustrated</u> this purpose inasmuch as the Contract binds
only PBS to "seek and . . . receive PMA's advance written consent
to use any particular broker or middle person."  Service Contract
§ 9.4(A).  As HHI points out, "there are no restrictions on
<u>Synagro's</u> ability to retain and pay HHI to perform the Schedule D
services, whatever restrictions might apply to <u>PBS</u>," Pl.'s Resp.
to Def.'s MSJ at 36 (emphasis in original) -- though, to be sure,
Synagro cannot bill the City for these services.  To the extent
one purpose of the Agreement was that "Plaintiff would actually
be permitted to perform services on behalf of Synagro in
connection with the biosolids reprocessing project," Def.'s MSJ
Mem. at 40, that purpose has not necessarily been frustrated.

Two other problems exist with applying the doctrine of
frustration of purpose to this second "pillar."  Synagro argues
that when it "entered into the Consulting Agreement with
Plaintiff, it did so with the basic assumption that Plaintiff's
activities would not so severely damage Synagro in the City's
eyes that the City insisted on a $9.2 million reduction in the
Contract value."  <u>Id.</u> at 43.  But Synagro has pointed to no

55

activities on HHI's part that <u>caused</u> this reduction aside from a September 25, 2008 interview between Markman and Hicks that postdated the City's September 17, 2008 decision to renegotiate the Contract.  In fact, it appears that it was media reports about an unfolding bribery scandal involving Synagro in Detroit that prompted the City's reassessment of the Contract.  In any event, Synagro has stipulated that on September 5, 2008, its counsel communicated to Markman "that Synagro management was eager to make sure that Synagro would be awarded the Contract," Ex. T to Def.'s Stmt. ¶ 4(l), and HHI correctly notes that "Markman did not recall Synagro challenging her view that compensating Hicks was a waste of money, or taking any steps to change her mind about the conditions that the City was imposing." Pl.'s Resp. to Def.'s MSJ at 41.  The frustration of purpose doctrine only applies when "a party's principal purpose is substantially frustrated <u>without his fault</u>."  Restatement (Second) of Contracts § 265 (emphasis added).  Because we cannot as a matter of law conclude on the record before us that Synagro bore <u>no</u> responsibility for the City's decision to renegotiate the Service Contract, we cannot apply the frustration of purpose doctrine to discharge Synagro's obligation to HHI.

Finally, Synagro has failed to demonstrate that the

City's renegotiation of the Service Contract was "a truly unexpected event." Step Plan Servs., 12 A.3d at 412. While it is true, as Synagro notes, that "Markman testified at her deposition that she 'absolutely' thought that paying Plaintiff anything under Schedule D was a 'waste of money,'" Def.'s MSJ Mem. at 43 (quoting Markman Dep. at 114-15), this estimation does not appear to have been grounded in any particularly egregious or unexpected behavior on Hicks's part. Instead, the record supports the inference that Markman objected to Hicks because she felt he was an "operator," Markman Dep. at 124, whose services represented "fat in the contract that the City is not paying for." Id. at 115. Given that Synagro's Agreement with HHI essentially secured Hicks's services as a political operative,[11] it is not surprising that Markman drew the conclusions she did. Synagro contracted to purchase Hicks's influence -- it is by no means unexpected that the City had no interest in paying for this commodity.

Because genuine disputes of fact remain as to whether

_____

[11] As we observed in a far more dramatic context, the use of such operatives is hardly unknown in the City's service procurement history. See, e.g., United States v. Earle McNeill, 709 F.Supp.2d 360, 363-64 (E.D. Pa. 2010) and notes 4 and 5 therein.

(1) the purpose of the Agreement between Synagro and HHI has been frustrated by the City's renegotiation of the Service Contract, (2) Synagro bore any fault in bringing about this renegotiation, and (3) the City's renegotiation was an unexpected event, we deny Synagro's motion for summary judgment to the extent it seeks to discharge the Agreement due to frustration of purpose.

### D.   HHI's Claim For Unjust Enrichment

Finally, Synagro argues that it is entitled to summary judgment on HHI's claim for unjust enrichment inasmuch as "there is no doubt that the legal relationship between Plaintiff and Synagro was created and governed by their written contract, and it is that contract that is the exclusive source of their obligations to each other and any remedies Plaintiff might claim against Synagro."  Def.'s MSJ Mem. at 46.  HHI responds that "if Synagro is successful in maintaining its frustration of purpose defense, the Consulting Agreement would be dissolved, but Hicks would be allowed a claim for restitution.  Unjust enrichment is a quasi-contractual doctrine that incorporates the concept of restitution."  Pl.'s Resp. to Def.'s MSJ at 44.

While it is true that "the doctrine of unjust enrichment is inapplicable when the relationship between parties

58

is founded upon a written agreement or express contract, regardless of how harsh the provisions of such contracts may seem in the light of subsequent happenings," <u>Wilson Area Sch. Dist. v. Skepton</u>, 895 A.2d 1250, 1254 (quotations omitted), Pennsylvania courts have held that "where the party excused by impossibility has partly performed the contract on his side before the impossibility arises . . . justice requires the imposition of a quasi-contractual obligation on the party receiving such performance to pay its fair value."  <u>West v. Peoples First Nat'l Bank & Trust Co.</u>, 106 A.2d 427, 433 (Pa. 1954) (quotation marks omitted).

Although we deny Synagro's motion for summary judgment to the extent it is based on a claim of frustration of purpose, we do not dismiss this defense.  As a result, we will now permit HHI's unjust enrichment claim to survive.

BY THE COURT:

__\s\Stewart Dalzell